UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

    vs.

JUN WANG,

                           **Defendant.**

8:24-CR-389
(MAD)

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **OFFICE OF THE UNITED STATES ATTORNEY**<br>P.O. Box 7198<br>100 South Clinton Street<br>Syracuse, New York 13261-7198<br>Attorneys for the United States | **MICHAEL D. GADARIAN, AUSA**<br>**MICHAEL F. PERRY, AUSA**<br>**TAMARA THOMSON, AUSA** |
| **CDH LAW, PLLC**<br>211 Tompkins Street<br>Syracuse, New York 13204<br>Attorney for Defendant | **NICOLAS HURTADO CORTES, ESQ.** |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On September 18, 2024, Defendant Jun Wang was indicted on one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h). *See* Dkt. No. 1. On October 24, 2025, Defendant waived his right to a jury trial pursuant to Rule 23(a) and (c) of the Federal Rules of Criminal Procedure. *See* Dkt. No. 73. This included a waiver of any right to have this Court make specific findings of fact, other than findings regarding venue and guilt. *See id.* at 1.[1]

---

[1] Neither party requested the Court to make such specific findings of fact in open court or in a written decision or opinion prior to issuance of the verdict. *See* Dkt. No. 73. As such, Defendant

1

A bench trial was held before this Court on December 2, 2025, during which the Government called eight witnesses and introduced various documentary evidence and other exhibits. *See* Text Minute Entry 12/02/2025; Dkt. No. 91. Defendant elected not to testify. The Court thereafter set a schedule for post-trial briefing, permitting the parties to rely on their recollection of the proceedings.[2]

As set forth below, the Court finds that the Government established by a preponderance of the evidence that venue was proper in the Northern District of New York and further established Defendant's guilt beyond a reasonable doubt.

## II. DISCUSSION

In his post-trial brief, Defendant contends that the Government's case suffers from "three fundamental flaws": (1) the evidence failed to support the claim that Defendant "was involved in a large-scale conspiracy with a sophisticated scheme to defraud victims and redeem gift cards;" (2) "the Government's evidence of Defendant's alleged knowledge, including under Rule 404(b), was inadequate to prove the requisite intent"; and (3) "the Government's assertion that [Defendant] attempted to 'cover his tracks' is contradicted by the record, which show[ed] that his conduct was carried out openly and in a manner reasonably consistent with legitimate employment." Dkt. No. 93 at 6. The Court disagrees.

---

waived his right under Rule 23(c) to have the Court make "specific findings of fact." The Court nevertheless provides limited findings of fact for purposes of explaining its verdict and addressing the arguments raised in the parties' post-trial briefs.

[2] At the end of the bench trial, the Government stated that, after conferring with Defense counsel, they did not believe a trial transcript was necessary to submit post-trial briefing. *See* Tr. at 168. The Court permitted the parties to file their briefs without a copy of the trial transcript. *See id.* at 168-69. However, as part of the Court's determination, it has reviewed a draft version of the trial transcript from the Court Reporter. The Court's citations throughout this Memorandum-Decision and Order are to the pagination in the top right corner of the draft transcript.

A.    **Elements of the Offense**

Section 1956 of Title 18, United States Code, provides in relevant part as follows:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> . . . (B) knowing that the transactions is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i). Pursuant to 18 U.S.C. § 1956(h), "any person who conspires to commit any offense in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

A "financial transaction" includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means. . . ." 18 U.S.C. § 1956(c)(4). "Specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of this title," 18 U.S.C. § 1956(c)(7), which includes "any act which is indictable under section 1341 [of Title 18] (relating to wire fraud)," 18 U.S.C. § 1961(1).

B.    **Bench Trial Evidence**

Before trial, the parties entered numerous stipulations concerning the facts and exhibits intended to be offered at trial. *See* Dkt. No. 80. The Court adopted the factual portions of the stipulations and admitted the stipulated exhibits at the beginning of trial. *See* Tr. at 4-7.

The first factual stipulation states that "between approximately June 2019 and June 2021, the Defendant, Jun Wang, redeemed approximately $2,285,039.81 in gift cards at a total of 140 Walmart and Sam's Club stores in Orlando, Florida, and the surrounding areas." Dkt. No. 80 at ¶ 1. "[A]mong the gift cards redeemed by the Defendant, were some originally purchased by M.Y., A.M., H.R., and C.W." *Id.* at ¶ 2. At trial, it was established through the testimony of the fraud victims, Walmart employees, and law enforcement agents that some of the gift cards redeemed by Defendant were originally purchased in the Northern District of New York.

As stipulated and proven at trial, the victims purchased gift cards because of various telephone fraud schemes wherein they sent the gift card numbers and PINs to fraudsters, who then forwarded the information to Defendant through a mobile app, WeChat. *See id.* at ¶ 3. As the Government notes, "[a]lthough the trial evidence did not establish that [D]efendant personally contacted the victims, he used the victims' gift card numbers and PINs to buy new gift cards shortly after the victims sent the information to the initial fraudsters." Dkt. No. 92 at 2; *see also* Govt. Tr. Exs. 1-9.

The four victims testified first at trial regarding the schemes that induced them into purchasing gift cards and their monetary losses. The Government established through this testimony at trial that Defendant redeemed Walmart gift cards in Florida that came from M.Y., A.M., H.R., and C.W., who originally purchased the gift cards in the Northern District of New York. *See* Tr. at 14-62.

Specifically, the parties agreed in their pre-trial stipulations that "on or about June 19, 2019, C.W. received a phone call from an individual identifying himself as "Max," who falsely informed C.W. that her computer had a problem and that she needed to pay money, in the form of

gifts cards, to resolve the issue." Dkt. No. 80 at ¶ 4.  C.W. testified that she then purchased a $500 gift card and read the card's information to the person on the phone.  *See* Tr. at 54-60.

Similarly, the parties stipulated that "on or about July 22, 2019, A.M. responded to an online posting for a babysitter/nanny position, purportedly placed by an out-of-state couple.  A.M. subsequently received a check from the alleged couple and was instructed to purchase three Walmart gift cards totaling $1,300."  Dkt. No. 80 at ¶ 5.  A.M. testified that the check ultimately bounced, but before it did, she purchased the Walmart gift cards and she provided the online party with the gift card numbers and PINs.  *See* Tr. at 28-36.

As to Y.M., she testified that, on September 11, 2020, she was contacted by a person who claimed a car had been rented under her name and drugs and blood were found in the car.  *See id.* at 16.  The caller requested Y.M.'s personal information and instructed her to purchase gifts cards to save her money from being stolen.  *See id.* at 16-18.  Y.M. stated she purchased the gift cards, and she then read the cards' information to the caller.  *See id.* at 18-22.

Finally, as to H.R., she testified that on January 22 or 23, 2021, she was friend requested on Facebook by someone whose name she knew.  *See id.* at 38.  That person informed H.R. that she had been awarded a large sum of money and encouraged H.R. to apply for the same program, purportedly through the Department of Health and Human Services.  *See id.* at 38-48.  H.R. testified that she bought gift cards to apply to the program and provided the gift card information in response to the Facebook messages.  *See id.* at 48-52.

The Government also called Marlange Morency as a witness at trial.  *See id.* at 74.  Ms. Morency explained that she previously worked as an asset protection manager at Sam's Club in Florida.  *See id.* at 76.  She testified that, in 2019, she noticed suspicious activity regarding gift card purchases wherein a male (who the Government later identified through other evidence as

5

Defendant) was going through the self-checkout line and scanning a lot of gift cards. *See id.* at 79-83. Ms. Morency explained that she confronted Defendant and asked him what he was doing. Ms. Morency told Defendant that what he was doing was wrong, that he needed to leave the store, and if he came back, she would call the police. *See id.* at 83-84. She took a picture of Defendant's phone which had a gift card appearing on the screen. *See id.* at 84; *see also* Govt. Tr. Exs. 20-22. Ms. Morency recalled seeing Defendant in the store after this interaction. The Court agrees with the Government that this evidence established that Defendant "was on notice that his gift card redemption activities were fraudulent long before most of the conduct charged in the indictment." Dkt. No. 92 at 3.

      The Court then heard testimony from Darick Leighty, a senior investigator at Walmart Global Investigations. *See* Tr. at 91. He explained that, in his role as a senior investigator, he investigates organized retail crimes for Walmart and its subsidiaries. *See id.* at 92. Mr. Leighty testified at trial about his training and experience and the process of buying and using gift cards at Sam's Club, a Walmart subsidiary. *See id.* at 92-96. He stated he became aware of Defendant through two means: a law enforcement officer contacting him about an investigation, and through an internal review of gift card purchases that were made in one state and then shortly used in another state. *See id.* at 96-97. Mr. Leighty testified that Defendant's activity was flagged internally because it was outside the normal parameter of business that he sees. *See id.* at 98. Mr. Leighty compiled, and the Government entered into evidence, a spreadsheet of 6,907 gift cards that were used in 4,738 transactions at 140 different Walmart and Sam's Club stores and totaled approximately 2.35 million dollars in redemption value. *See* Govt. Tr. Ex. 10. Mr. Leighty confirmed that Defendant's presence in the stores and use of the gift cards was depicted in surveillance camera footage and traceable through receipts, both of which contained time and

location information. *See* Govt. Tr. Exs. 10-21. During his testimony, the Government asked Mr. Leighty to explain a few examples of when, where, and how Defendant was using the gift cards listed in the spreadsheet. *See* Tr. at 104-32.

As to the fraud victims from the Northern District of New York, Mr. Leighty testified that individuals purchased gift cards in the Northern District of New York that were then spent in Florida. *See id.* at 125-28. One of the gift cards was purchased in New York and then used in Florida within less than one hour. *See id.* at 128. Mr. Leighty testified that Defendant had stacks of gift cards. *See id.* at 109, 131.

The Government also presented testimony from Federal Bureau of Investigation ("FBI") Special Agent Ryan Nicolos who is assigned to the Los Angeles financial institution fraud squad. *See id.* at 62. Agent Nicolos, along with another agent, interviewed defendant at the Los Angeles airport on December 2, 2021. Agent Nicolos identified Defendant in the courtroom. *See id.* at 65, 71.

During the December 2021 interview, Defendant told the agents he used to own an online merchandise business but was then working for a China-based company. *See id.* at 69. Defendant described his work for the China-based company as him receiving messages from his boss on an app called WeChat which would contain gift card serial numbers. *See id.* Defendant would then use those serial numbers to redeem funds in his digital wallet and use those funds at stores, like Walmart, to purchase physical gift cards. *See id.* Defendant would send a photo of the physical gift card to his boss in China and then destroy the physical card to prove that he was not using the gift cards, himself. *See id.* Defendant told the agents he had redeemed approximately $50,000 in gift cards. *See id.* at 70. Defendant also told them he did not know where the gift card serial numbers his boss sent originally came from. *See id.*

The Government's last trial witness was FBI Agent Douglas Soika, the lead case agent in the investigation into Defendant's activities. *See id.* at 139-40. Agent Soika testified that, in December 2021, Defendant was interviewed by FBI agents in Los Angeles, California, after Defendant was approached at the airport and his phone was viewed with consent. *See id.* at 142. The FBI also obtained a search warrant for Defendant's phone. *See* Govt. Tr. Exs. 27, 28.

The Government produced text messages from Defendant's phone as evidence of his knowledge and intent. *See* Dkt. No. 92 at 4 (citing Govt. Tr. Exs. 26, 29). The Government correctly reiterated some of the text messages that were introduced at trial in their post-trial brief, such as:

- In August 2019, Defendant asked a contact whether he was ready for both "Best Buy and Walmart," and Defendant went on to instruct that contact how to redeem gift cards at Walmart.

- That same month, Defendant encouraged a contact saved as "William Best Buy" to delete messages from him because "[k]eeping with you is not wise."

- Between April and August 2020, Defendant exchanged numerous messages with an attorney about possibly testifying for a friend in a criminal trial regarding the "Walmart gift card thing."

- In August 2020, Defendant described gift card redemptions to a contact he was trying to recruit and described the work as "daily work like a regular job."

Dkt. No. 92 at 4 (citations omitted); *see* Govt. Tr. Ex. 29.[3]

Agent Soika testified that he first met Defendant in March 2023 via a Zoom call. Defendant agreed to participate in the call with a Pennsylvania State Trooper who wanted to speak with Defendant about a Pennsylvania state police case. *See* Tr. at 155. Agent Soika

---

[3] In ruling on the parties' motions *in limine*, the Court expressly permitted the Government to introduce these text messages as evidence at trial. *See* Dkt. No. 87 at 8-11.

8

identified Defendant as the person who was on the Zoom call and sitting in the courtroom during trial. *See id.* at 156-67. The Zoom call was recorded, and approximately two minutes of the video was played for the Court during trial. *See id.* at 156. The Court has since reviewed the entirety of the recording.

During the recorded Zoom interview, Defendant stated that he was sent information from someone in China with gift card numbers and he would go to stores like Walmart in the United States. He told the law enforcement offices he would use a gift card at a Walmart self-check out to purchase other gift cards like Google or Steam. Defendant explained that he would review the pin numbers on the physical gift cards and send the information back to the person in China. Defendant said he did not know the person he was communicating with. When asked if Defendant had ever done something like this before, he said he would use gift cards for himself to buy groceries or gas, but that it also was not the first time he had engaged in a transaction similar to the one initiated by the Chinese company. He said the transactions would total about $500 or $800 and that he "probably" did it more than twenty times. Govt. Ex. 26 at 0:10:52. Defendant stated, "So I know they're in the gift card business, but I didn't even think this is something wrong." *Id.* at 0:11:26. He also said he was "not in the business" and it was not his job. *Id.* at 0:11:56, 0:12:05. Defendant denied "driving around all day, to, from Walmart to Walmart" to conduct the transactions. *Id.* at 0:12:49.

The Government also introduced evidence under Rule 404(b) that established Defendant's knowledge and intent. As part of the parties' pre-trial stipulations, they agreed as follows:

> On or about March 14, 2021, J.L., who was living in Pennsylvania, received a voicemail on her home phone falsely claiming that there was an issue with her Amazon account and that she needed to call a certain number to resolve it. J.L. called the number and was told by

9

    an unknown person to buy gift cards totaling $2,000 and to provide
    the Walmart gift cards in Florida the same day.

Dkt. No. 80 at ¶ 8.[4]  Of note, "[o]n or about October 20, 2023, the Defendant paid $1,000 back to J.L., [and] in exchange the related criminal charges against the Defendant in Northumberland County, Pennsylvania, were dismissed." *Id.*

  The day Defendant paid J.L. the $1,000, Defendant again spoke with Agent Soika. Agent Soika audio recorded the conversation. Agent Soika confirmed during trial that the voices in the recording belonged to himself and Defendant. *See* Tr. at 159-61. During the recorded conversation, Defendant made numerous statements, including the following: "The only loser is the lady"; "We all know. Easy to know. Only this lady lost $1,000"; and "Other than this lady, everybody's happy." Govt. Tr. Ex. 30B at 0:00:36, 0:01:04, at 0:02:04. Defendant explained to Agent Soika that "a lot of people do this," *id.* at 0:03:41, referring to people who will buy, for example a $100 gift card, and resell it online for $90. Defendant said the "bad people are behind the scenes" and the "good guys don't know" "the things." *Id.* at 0:04:08. Defendant referred to himself as a victim. *See id.* at 0:04:49. Defendant stated that he did "not know anything other than this," referring to the Pennsylvania case. *Id.* at 0:05:12.

**C. Venue**

  In his post-trial brief, Defendant contends that the Government failed to establish by a preponderance of the evidence that the overt acts committed by scammers are sufficient to support venue in the Northern District of New York, given the absence of any demonstrated connection to Defendant. *See* Dkt. No. 93 at 4-5. Defendant argues that the alleged connection between the scammers and Defendant is tenuous, at best, noting that there was no direct evidence establishing

---

[4] In ruling on the parties' motions *in limine*, the Court expressly permitted the Government to admit this evidence. *See* Dkt. No. 87 at 12-13.

such a link. *See id.* at 5. Further, Defendant contends that "the record shows that victims were deceived through different types of false pretenses, raising the possibility that the scams were unrelated or not part of a single conspiracy." *Id.* Additionally, Defendant argues that "the scammers did not exclusively obtain Walmart gift cards . . . further undermining any claim that all the scams were connected." *Id.* Finally, Defendant notes that the Government "relies on fewer than fifteen gift cards, out of 6,907 total gift cards, representing just 0.21%, to attempt to establish venue in the Northern District of New York. Such a minimal showing cannot satisfy its burden." *Id.*

"'The Constitution twice safeguards the defendant's venue right. . . .'" *United States v. Miller*, 808 F.3d 607, 613 (2d Cir. 2015) (quoting *United States v. Cabrales*, 524 U.S. 1, 6 (1998)). "Article III provides that '[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.'" *Id.* (quoting U.S. Const. art. III, § 2, cl. 3). "And the Sixth Amendment directs that, '[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial[ ] by an impartial jury of the State and district wherein the crime shall have been committed . . . .'" *Id.* (quoting U.S. Const. amend. VI). "These constitutional guarantees are reinforced by Rule 18 of the Federal Rules of Criminal Procedure, which directs that, '[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.'" *Id.* at 613-14 (quoting Fed. R. Crim. P. 18). At trial, the Government must demonstrate the propriety of the chosen venue by a preponderance of the evidence. *See United States v. Murgio*, 209 F. Supp. 3d 698, 721 (S.D.N.Y. 2016) (quoting *United States v. Motz*, 652 F. Supp. 2d 284, 290 (E.D.N.Y. 2009)). "Generally, 'the Government need only allege that criminal conduct occurred within the venue,

11

even if phrased broadly and without a specific address or other information, in order to satisfy its burden with regard to pleading venue.'" *Id.* (quoting *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010)); *see also United States v. Mackey*, 652 F. Supp. 3d 309, 327 (E.D.N.Y. 2023).

Certain offenses, like money laundering, have specific venue provisions. Title 18, United States Code, Section 1956(i) provides as follows:

> (1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in –
>     (A) any district in which the financial or monetary transaction is conducted; or
>
>     (B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.
>
> (2) A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.
>
> (3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.

18 U.S.C. § 1956(i). "[T]he term 'conducts' includes initiating, concluding, or participating in initiating, or concluding a transaction." *Id.* § 1956(c)(2).

Venue is proper in a conspiracy prosecution in any district where "an overt act in furtherance of the conspiracy was committed by any of the coconspirators." *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) (citations omitted). An overt act will establish

12

venue even of conspiracy statutes, like money laundering, that do not require proof of an overt act as an element of the offense. *See Whitfield v. United States*, 543 U.S. 209, 218 (2005) (citations omitted). For example, telephone calls from one district to another can establish venue for a conspiracy prosecution in the latter district "so long as they further the ends of the conspiracy." *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) (citations omitted); *see also United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999) (holding that a conspirator's telephone calls from Manhattan to Brooklyn established venue in the Southern District of New York).

"'[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue.'" *United States v. Geibel*, 369 F.3d 682, 696 (2d Cir. 2004) (quotation omitted). "Even without knowledge or intent to cause an act in furtherance of the crime to occur in the district of venue, venue may still be proper." *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016). The Second Circuit has "held that a defendant need not intentionally or knowingly cause an act in furtherance of a charged offense to occur in the district to establish venue. Instead, it is enough that 'it is foreseeable [to the defendant] that such an act would occur in the district' and that act does in fact occur." *Id.* (quotations omitted); *see also United States v. Kirk Tang Yuk*, 885 F.3d 57, 69-70 (2d Cir. 2018) ("Actual knowledge that an overt act was committed in the district of prosecution is not required, however: venue will lie if a reasonable jury could find that it was 'more probable than not' that the defendant 'reasonably could have foreseen' that part of the offense would take place in the district of prosecution") (quotation omitted). When a defendant is alleged to be part of a conspiracy that acts nationwide, acts in furtherance of the crime may be foreseeable in multiple districts. *See Lange*, 834 F.3d at 72-73 (holding that the defendants who operated a fraudulent business in

13

Washington could be prosecuted in New York based upon "cold calls" and emails to New York residents); *United States v. Royer*, 549 F.3d 886, 894-95 (2d Cir. 2008) (holding that the defendants, who were located in California and operated websites designed to manipulate stock prices, could be prosecuted in New York where some website subscribers resided).

As noted, Section 1956(i)(2) provides that venue for a money laundering conspiracy lies either "in the district where venue would lie for the completed offense" or "in any other district where an act in furtherance of the attempt or conspiracy took place." 18 U.S.C. § 1956(i)(2). The Government established at trial that this District is a proper venue under both alternatives.

First, this District is a proper venue for the completed offense under Section 1956(i)(1)(B) because it is a district where a prosecution for the underlying specified unlawful activity (i.e., wire fraud) could be brought, and Defendant participated in the transfer of the proceeds of the specified unlawful activity from this District to where he acted.[5] A transfer of funds (in this case, the proceeds of the specified unlawful activity) from one place to another is a single, continuing transaction, and any person who conducts any part of it can be charged in any district in which it takes place. *See* 18 U.S.C. § 1956(i)(3). The victims' purchase of the gift cards in this District started the "transaction" under Section 1956(c)(3) because it was a "purchase." The purchased funds (i.e., the proceeds of the specified unlawful activity) were transferred from one place (this District) to another (Florida), by "any other means" (i.e., by the victim sending the gift card number and PIN via text message). Defendant's use of those proceeds completed the transfer of the funds from New York to Florida. *See United States v. Hoskins*, 44 F.4th 140, 157-58 (2d Cir. 2022) (holding that "two transfers that are 'each ... an integral part of a single plan to transfer

---

[5] The gift cards are the "proceeds" of the specified unlawful activity. *See* 18 U.S.C. § 1956(c)(9) ("[T]he term 'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity").

14

funds' can be considered part of a single transaction" and venue was proper in the district where the funds were sent from "even if [the defendant's] co-conspirators did not fully know the details of the intermediary's payments" because "they did know the purpose and expectation of the transfers") (quotation omitted).

Second, venue is also appropriate under Section 1956(i)(2) because this District is "where an act in furtherance of the . . . conspiracy took place." *United States v. Booth*, 583 F. Supp. 3d 545, 550-51 (S.D.N.Y. 2022) ("Since 'venue is proper in any district in which an overt act in furtherance of the conspiracy was committed,' these allegations establish that venue for the underlying unlawful activity lies in this District. Therefore, venue to prosecute a conspiracy to launder the proceeds of that securities fraud conspiracy also lies in this District") (quoting *Whitfield*, 543 U.S. at 218); *United States v. Iossifov*, 45 F.4th 899, 911-12 (6th Cir. 2022) ("Because the preponderance of the evidence shows that 'an act in furtherance of the attempt or conspiracy took place' in the Eastern District of Kentucky, the district court's venue determination was proper").

At trial, the Government established that Defendant received gift card information obtained from fraud victims around the United States, including within the Northern District of New York. Defendant then used an application on his phone to turn the gift card numbers into bar codes so that he could scan them to buy other gift cards at Walmart and Sam's Club registers. *See* Tr. at 102-04. In at least one instance, victim A.M. sent the initial coconspirator both the gift card and copies of receipts, showing where the purchase took place (in that instance, Latham, New York). *See id.* at 125-26; *see also* Govt. Tr. Exs. 6A-6C.

Based on the facts produced at trial, the Court finds that the Government established by a preponderance of the evidence that venue was proper in the Northern District of New York.

15

Aside from the specific example discussed above, the reasonably foreseeable requirement for venue was met because the nature of Defendant's role in the conspiracy involved his receipt and negotiation of thousands of gift cards and millions of dollars in stolen fraud proceeds, the very nature of which made it foreseeable that victims would come from around the country. *See United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003). As such, the Court finds that venue was proper under both provisions of Section 1956(i)(2). *See United States v. Scott*, No. 17-cr-630, 2023 WL 6064329, *10 (S.D.N.Y. Sept. 14, 2023) (holding that venue was proper for bank fraud conspiracy where overt act took place in district and the government "adduced evidence that [the defendant] was aware that international USD transactions would use U.S. correspondent accounts").

**D.     Determination of Guilt**

The fraudulent transactions are alleged to have occurred between June 19, 2019, and June 2021. *See* Dkt. No. 1. The trial stipulations, testimony during trial, and exhibits demonstrate the same. Defendant stated during the 2021 interview with FBI Agents, the 2023 interview with an FBI agent and a police officer, and the 2023 recorded conversation with Agent Soika that he was merely a cog in a machine wherein people from a company he worked for in China would send him information that he would use to purchase a gift card in the United States and he would send the new gift card's information back to the company. Defendant argues that the Government failed to prove that he had the requisite knowledge concerning the fraudulent nature of the transactions and that he had an intent to defraud others.

The text messages on Defendant's phone and some of the statements he made during the recorded conversation with Agent Soika belie Defendant's contention that he did not know what was going on. *See* Govt. Tr. Ex. 29. As the Government notes, Defendant made these admissions

in 2023 after the redemptions charged in the conspiracy. *See* Dkt. No. 92 at 6. However, "[d]efendant did not state (or even imply to) Agent Soika that he only learned about the fraudulent nature of his gift card redemptions after the fact." *Id.* Rather, when speaking to Agent Soika, Defendant said "The only loser is the lady"; "We all know. Easy to know. Only this lady lost $1,000"; and "Other than this lady, everybody's happy." Govt. Tr. Ex. 30B at 0:00:36, 0:01:04, at 0:02:04.

In its post-trial brief, the Government accurately states the only logical conclusions that the evidence demonstrates—that if Defendant truly believed his conduct was entirely legal or innocuous, then he would not have gone to so many different store locations and used so many gift cards. It is extremely important to restate the parties' stipulation that Defendant redeemed approximately $2,285,039.81 in gift cards within two years. *See* Dkt. No. 80 at ¶ 1. Defendant's statements to Agent Soika about who wins and loses in these situations is also extremely telling to the Court regarding Defendant's knowledge and intent. Defendant was approached by Ms. Morency about his conduct, he texted others to delete their messages with him, and he texted another person about "trying" "both Best Buy and Walmart." Dkt. No. 92 at 4; *see* Govt. Tr. Ex. 29. Defendant's conduct is sufficient for the Court to find beyond a reasonable doubt that he conspired to launder monetary instruments, even if the evidence is circumstantial. *See United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) ("Where direct evidence is absent, however, '[c]ircumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime'") (citation omitted); *United States v. Huezo*, 546 F.3d 174, 181 (2d Cir. 2008) ("There was sufficient circumstantial evidence to connect Huezo to this money laundering conspiracy and to support an inference that Huezo

knew about the conspiracy and acted with the specific intent to participate in it for the purpose of concealing or disguising one of the statutorily specified attributes of the funds").

In his post-trial brief, Defendant argues that the evidence does not support the Government's claim that he was part of a large conspiracy "because at least four specific facts demonstrate that no link can be established between [Defendant] and the scammers." Dkt. No. 93 at 6. Specifically, Defendant notes that M.Y. testified that she received a phone call claiming her vehicle had been found in Text with drugs inside, a false pretext used to convince her that her money and Social Security information were in jeopardy. *See id.* at 7. The scammers fraudulently presented themselves as government officials, leading M.Y. to buy gift cards under the false pretense of protecting her money. *See id.* H.R. testified that someone assuming her friend's identity messaged her on Facebook Messenger about a fake grant from the Department of Health and Human Services. *See id.* Later, H.R. texted a phone number given by her "friend" and bought the gift cards as a processing fee for the grant. *See id.* Next, Defendant notes that C.W. received a phone call from an individual identifying himself as "Max," who falsely informed C.W. that her computer had a problem and that she needed to pay money, in the form of gift cards, to resolve the issue. *See id.* (citing Dkt. No. 80). Finally, Defendant notes that A.M. responded to an online posting for a babysitter/nanny position, purportedly placed by an out-of-state couple. *See id.*

A.M. subsequently received a check from the alleged couple and was instructed to purchase three Walmart gift cards totaling $1,300. *See id.* (citing Dkt. No. 80). Defendant contends that these "four alleged scams are distinct and bear no relation to one another." *Id.* As such, Defendant argues that these unrelated, dissimilar scams are insufficient to establish a single conspiracy. *See id.* at 7-8.

18

Defendant's arguments are misplaced. In order to prove a single conspiracy, rather than multiple conspiracies, "'the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.'" *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) (quotation and other citations omitted). "'The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.'" *Id.* (quotations omitted). "Indeed, in order for a single conspiracy to be found, it is not necessary that the conspirators even know the identities of all the other conspirators." *Id.* (citations omitted). "Where an alleged conspiracy 'encompass[es] members who neither know one another's identities . . . nor specifically know of one another's involvement,' . . . it is permissible for the jury to find that there was a single conspiracy so long as a reasonable juror could conclude beyond a reasonable doubt (1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness of its general nature and extent.'" *Id.* at 47-48 (quotations omitted).

Here, the Government's evidence at trial established beyond a reasonable doubt the existence of a single conspiracy. The fact that M.Y., H.R., C.W., and A.M. were deceived using different fraudulent pretexts does not transform this single conspiracy into multiple ones. The participants in this conspiracy clearly agreed on the "'essential nature' of the enterprise and 'their goals [were] not at cross purposes.'" *Eppolito*, 543 F.3d at 48 (quotation and other citation omitted).

Defendant also argues that, contrary to the indictment, the victims were not exclusively asked to provide Walmart gift cards, which he claims casts doubt on the alleged connection between the scammers and Defendant. *See* Dkt. No. 93 at 8. Again, the Court disagrees. The

19

fact that some victims were asked to provide gift cards to stores other than Walmart does not alter the general nature and extent of the conspiracy. *See Eppolito*, 543 F.3d at 48 (quotations omitted).

Finally, the Court finds Defendant's remaining arguments unpersuasive. For example, the fact that Defendant did not redeem all the gift cards purchased by M.Y. and H.R. does nothing to undermine the existence of the conspiracy.

Accordingly, the Court finds that the Government established beyond a reasonable doubt that Defendant is guilty of conspiracy to launder monetary instruments as charged in the indictment.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, the testimony and evidence introduced at trial, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant is **GUILTY** as charged in count one of the indictment; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: February 12, 2026
       Albany, New York

_Mae A. D'Agostino_
U.S. District Judge